ANTHONY T. FEYH, Individually and Doing Business as WYCKOFF PRESS, Plaintiff, *v.* BRANDTJEN & KLUGE, INC., a Minnesota Corporation, Defendant.

Supreme Court, Special Term, Queens County, December 20, 1954.

*Joseph H. Gellman* for plaintiff.

*Wasserman & Shagan* for defendant.

HUNTINGTON, J. The plaintiff in this action operates a printing establishment, and on January 7, 1947, contracted with the defendant for the purchase of two Kluge printing presses described in the contract, plaintiff's Exhibit 1, as two twelve by eighteen six-roller Kluge automatic platen press, combination and die cutting, for the price of $5,116.32. This included a base price of $4,180, to which was added 20% or $836, to cover a price increase which took place in the latter part of 1946, freight and taxes.

Before enumerating the defenses, a brief recital of what happened will clarify the matter.

Due to a strike in defendant's plant for the whole of the year 1947, it was not until approximately eighteen months after the making of the contract, that the plaintiff was notified that the order was completed and the presses had been shipped. The following month, on October 6, 1948, the defendant advised the plaintiff in writing, that the presses had been shipped from St. Paul, Minn., on September 30, 1948. Still, the plaintiff was given no inkling of what was in store for him.

When the plaintiff received the first notice after the extended period of inactivity, he called the defendant's local representative in New York, and told him that he actually only wanted one press, since due to the delay, he had in the meantime, acquired a Giant press No. 5, a press of another make. Defendant's manager, one Edwards, told him he would be sued if he did not take both of the two presses specified in the original contract, and after some argument, plaintiff acquiesced. At this time, although Edwards was well aware of the fact that he intended to insist on collecting about $1,700 over and above the original contract price, he still said nothing, and as noted, even demanded that plaintiff perform the contract to the letter.

To make room for the two new Kluge presses, plaintiff proceeded to sell two of his own presses, a Victoria and a Pony Miehle, which presses were capable of doing die cutting as were the Kluge presses, while the remaining six presses in his shop were unsuitable for die cutting. In the meantime, plaintiff farmed out such work to competitors pending the arrival of the Kluge presses. On October 8, 1947, Edwards appeared at plaintiff's place of business with the shipping papers for the new presses *which had then arrived at the freight depot* in New York, and told Feyh, the plaintiff, that unless he agreed to pay the $1,700 increase over the contract price, he (Feyh) could not have the presses.

Feyh told Edwards: "You have me over a barrel. I'll have to take them." Feyh thereupon signed notes and a chattel mortgage; but he did not sign the changes which Edwards proceeded to make in Feyh's copy of the contract.

Feyh paid each note as it came due, until he had paid the original contract price. He then brought the present action to have the chattel mortgage and the balance of the notes cancelled, as having been obtained from him by a form of business duress and coercion; but he has paid the amount of the notes into court, the notes having been impounded by the court, thereby preserving the *status quo,* pending the disposal of this litigation.

By way of pleading, defendant claims (1) a waiver by the plaintiff by accepting the presses, (2) a modification of the original agreement by executing the notes and chattel mortgage and (3) estoppel. In addition, a motion was made and granted at the trial, to plead accord and satisfaction.

Actually, these defenses do not meet the main issue in this case, because all of them, whether it be a waiver, a novation, or an accord and satisfaction, presuppose a free agent, acting without the compulsion of a club over his head, and thus we come back to the main issue, viz.; was the pressure exerted on the plaintiff to agree to the increased price a legal wrong, for which the law gives a remedy?

Not every form of business or financial pressure constitutes duress in a legal sense. In *Criterion Holding Co.* v. *Cerussi* (140 Misc. 855, 856), it was said: " It is true, of course, that duress is not established merely by proof that consent was procured on account of the pressure of financial circumstances. (*McPherson* v. *Cox,* 86 N. Y. 472; *Dunham* v. *Griswold,* 100 id. 224.) Accordingly, a threat to enforce a legal claim by lawful means will never constitute duress. (*Lilienthal* v. *Bechtel Brewing Co.,* 118 App. Div. 205; *MacFarland* v. *Liberty National Bank of New York,* 166 N. Y. Supp. 393.) "

I do not take seriously the contention that this was a more expensive model of a press than plaintiff had ordered. The contract specified no certain model, merely a certain size. No effort was made to sell plaintiff a more expensive model and to procure his voluntary consent to it. In fact, plaintiff testified that the first time he heard any discussion about the difference between a model " N " and model " NA " was at the trial; and I see no reason to doubt this testimony.

The president of defendant company, who was a witness at the trial, gave the extraordinary testimony that he knew from the price that a model '' N '' was called for by the original contract but that defendant intended to supply a model '' NA '' from the beginning. See page 47 of the minutes where, in answer to this question: '' Q. Did you ever call it to the attention of the plaintiff in any way that you were shipping to him an '' NA '' instead of an '' N '' model? '', he gave this answer: '' A. We knew we were going to ship an '' NA '' model when we took the order.''

I think that there are only two points which need be discussed to arrive at a decision in this case.

The first is the effect of the so-called escalator clause, which appears as a written part of an otherwise printed form of contract. This clause reads as follows: '' These prices subject to increase at vendor's option to effective permitted legal prices prevailing on date of shipment with additional cash increase subject to same terms.''

At the trial, defendant moved to amend his answer to claim that this clause was understood in different ways by the contracting parties, and thus there was no meeting of minds and no contract. This motion was denied, since I was of the opinion that making the motion, for the first time, while the trial was in progress was too late in the day to change the whole theory of the litigation.

Up to that time, defendant had been contending that the escalator clause had not destroyed the contract, but on the contrary, was a binding commitment by the plaintiff to buy the presses at some indefinite price, which the seller would set in the future. Since the denial of his motion, defendant has reverted to that position. I think it is unsound. This contract was prepared by the seller and the clause in question inserted in the contract, by the seller's representative. Its dubious meaning therefore, should be resolved strictly against the seller. Also, since it is evident that the parties were attempting to make a binding contract, a construction should be avoided which would effectively destroy any contract.

Looking at the clause in this light, and having in mind the recent (at that time) expiration of the price control regulations, I can only conclude that the parties intend to cover the situation, in the event of a reimposition of price control regulations. In that case, there would thereupon be '' permitted legal prices prevailing on date of shipment '' although ordinarily, in our

free economy, we have no such thing as a " permitted legal price " for a commodity, except perhaps under " Fair Trade " statutes or certain valid contracts applying only to specific articles. This reasoning likewise, explains the allusion to " additional cash increase " in the latter part of the clause, which I take it, referred to the Government restrictions on credit which were prevalent at the time of price control.

Since it is conceded that at the time of delivery of the presses in October, 1948, there were no Government price controls, I hold that no justification for the price increase is to be found in this clause.

The second point which requires discussion is the scope of the " duress of property " doctrine in New York, since concededly there was no duress of plaintiff's person.

*Harmony* v. *Bingham* (12 N. Y. 99), I think, points the way to the proper answer to this question. While it is true that many of the cases on this subject contain allusions to the unlawful pressure exerted on the complaining party because of the need to recover *his own property,* it does not follow from this, that legal title to the property being in the victimized party, is a *sine qua non* before making out a case of duress of goods.

The rationale of the case seems to turn more on the party's right to possession than on his legal title. Several cases are mentioned in the course of the extended opinion in *Harmony* v. *Bingham (supra)*, where the plaintiff did not have legal title, e.g., *Smith* v. *Bromley* (3 Doug. 695), cited at pages 109–110, which did not involve either title or possession of goods, but where money was wrongfully exacted for signing a certificate.

This would seem to be especially so, where all the seller retained was a naked legal title to secure the price, as the seller did in our present case, and then seeks to expand that right to include a new price, set by himself *in invitum*.

A number of other points made by the defendant such as estoppel, do not, I think, require any extended discussion. It seems clear to me that defendant was not misled by the plaintiff's inactivity, nor did it change its position in reliance upon it.

For the reasons indicated, judgment is granted to the plaintiff, with costs. The above opinion will constitute findings under section 440 of the Civil Practice Act, and no other findings will be made or passed upon.

Settle judgment on notice.